BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD TROY BISHOP, Derivatively on Behalf of Nominal Defendant GERON CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> JOHN A. SCARLETT, ANDREW J. GRETHLEIN, MICHELLE J. ROBERTSON, FAYE FELLER, ANIL KAPUR, JIM ZIEGLER, DAWN C. BIR, GAURAV AGGARWAL, V. BRYAN LAWLIS, JOHN F. MCDONALD, SUSAN M. MOLINEAUX, ELIZABETH G. O'FARRELL, and ROBERT J. SPIEGEL, <br><br> Defendants, <br><br> and <br><br> GERON CORPORATION, <br><br> Nominal Defendant. | Case No. _____ <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Edward Troy Bishop ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Geron Corporation, Inc. ("Geron" or the "Company"), against current and former members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties and violations of federal law.  Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, filings with the United States Securities and Exchange Commission ("SEC"), press releases published by and regarding Geron, legal filings, news reports, securities analysts' reports about the Company, the securities class actions *Dabestani v. Geron Corporation, et al.*, Case No. 3:25-cv-02507-CRB (N.D. Cal.) and *Potvin v. Geron Corporation, et al.*, Case No. 3:25-cv-02563-CRB (N.D. Cal.) (the "Securities Class Actions"), and other publicly available information.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought by Plaintiff on behalf of Geron against certain of its officers and current and former members of the Company's Board for breaches of their fiduciary duties between at least February 28, 2024 and February 25, 2025, inclusive (the "Relevant Period").

2. Geron is a commercial-stage biopharmaceutical company that specializes in the development of therapies for the treatment of cancer. The Company's primary product is imetelstat, sold under the brand name Rytelo. Rytelo is a telomerase inhibitor aimed at treating hematologic malignancies, including myelofibrosis and essential thrombocythemia.

3. On June 6, 2024, the Company secured FDA approval for Rytelo for use in the treatment of adult patients with transfusion-dependent ("TD") anemia, defined as those with low to intermediate-risk myelodysplastic syndromes ("MDS"), requiring four or more red blood cell units over the course of eight weeks and who are not eligible for erythropoiesis-stimulating agents

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

("ESAs").

4.     Throughout the Relevant Period, certain of the Company's directors and officers issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) a lack of awareness of Rytelo among health care providers hindered the Company's ability to take advantage of the purportedly large market for the drug; (ii) Rytelo's commercial prospects were further harmed by seasonality and competition; (iii) the Individual Defendants understated the risks associated with the burdens of the weekly monitoring requirement for Rytelo; and (iv) as a result of the foregoing, Rytelo's commercial prospects were materially overstated and the Individual Defendants positive statements concerning the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis at all relevant times.

5.     On February 26, 2025, the truth emerged when the Company announced its fourth quarter and full year 2024 financial results, revealing that Geron had "observed flat revenue trends over the last few months." The Company attributed the stagnating growth to seasonality, competition, a lack of awareness of Rytelo among healthcare providers, and the burden associated with Rytelo's weekly monitoring requirements.

6.     On this news, the price of Geron stock declined 32.07% in one day, from a close of $2.37 per share on February 25, 2025 to a close of $1.61 per share on February 26, 2025.

7.     As a result of the foregoing, the Securities Class Actions were filed against the Company and certain of its executive officers, not only exposing the Company to massive class-wide liability, but causing Geron to incur significant costs to defend itself in those actions.

8.     In light of the breaches of fiduciary duty by the Individual Defendants, most of whom are the Company's current directors, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Actions, and that the Individual Defendants are beholden to each other based on their longstanding business and personal relationships, the Individual Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of

the Company. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9).

10.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

12.    In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

13.    Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Geron is headquartered in this District, Defendants have conducted business in this District, and a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

*Plaintiff*

14.    Plaintiff is, and has been at all relevant times, a shareholder of Geron.

*Nominal Defendant*

15.    Nominal Defendant Geron is incorporated under the laws of Delaware with its principal executive offices located at 919 East Hillsdale Blvd., Suite 250, Foster City, California 94404. Geron's common stock is traded on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "GERN."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*Individual Defendants*

16.    Defendant Dawn C. Bir ("Bir") has served as the Company's Chief Executive Officer ("CEO") since March 10, 2025 and as a member of the Board since March 2019. As of March 1, 2024, Defendant Bir beneficially owned 481,000 shares of Geron common stock, worth roughly $1.1 million.[1]

17.    Defendant Gaurav Aggarwal ("Aggarwal") has served as a member of the Board since November 2023 and serves as Chair of the Strategic Committee and as a member of the Compensation Committee.

18.    Defendant V. Bryan Lawlis ("Lawlis") has served as a member of the Board since March 2012 and serves as Chair of the Nominating and Governance Committee and as a member of the Audit Committee. As of March 1, 2024, Defendant Lawlis beneficially owned 601,000 shares of Geron common stock, worth roughly $1.4 million.

19.    Defendant John F. McDonald ("McDonald") has served as a member of the Board since September 2022 and serves as a member of the Audit Committee and the Strategic Committee. As of March 1, 2024, Defendant McDonald beneficially owned 66,667 shares of Geron common stock, worth $150,667.

20.    Defendant Susan M. Molineaux ("Molineaux") has served as a member of the Board since September 2012 and serves as Chair of the Compensation Committee and as a member of the Nominating and Governance Committee. As of March 1, 2024, Defendant Molineaux beneficially owned 731,527 shares of Geron common stock, worth roughly $1.7 million.

21.    Defendant Elizabeth G. O'Farrell ("O'Farrell") has served as a member of the Board since March 2019 and serves as Chair of the Audit Committee and as a member of the Strategic Committee. As of March 1, 2024, Defendant O'Farrell beneficially owned 514,627 shares of Geron common stock, worth roughly $1.2 million.

---

[1]    Valuations of the Individual Defendants' holdings of Company stock are based on the $2.26 per share closing price of Geron stock on March 1, 2024.

22.     Defendant Robert J. Spiegel ("Spiegel") has served as a member of the Board since May 2010 and serves as a member of the Compensation Committee and the Nominating and Governance Committee. As of March 1, 2024, Defendant Spiegel beneficially owned 730,040 shares of Geron common stock, worth roughly $1.6 million.

*Former Director Defendant*

23.     Defendant John A. Scarlett ("Scarlett") served as the Company's CEO from September 2011 until March 10, 2025, as President from January 2012 until March 10, 2025, and as Chairman of the Board from December 2018 until March 10, 2025. Defendant Scarlett is named as a defendant in the Securities Class Actions. As of March 1, 2024, Defendant Scarlett beneficially owned 7,805,667 shares of Geron common stock, worth roughly $17.6 million and constituting 1.4% of the Company's total outstanding shares.

*Officer Defendants*

24.     Defendant Andrew J. Grethlein ("Grethlein") has served as Executive Vice President ("EVP") and Chief Operations Officer ("COO") since January 2019. Defendant Grethlein is named as a defendant in the Securities Class Actions. As of March 1, 2024, Defendant Scarlett beneficially owned 2,230,046 shares of Geron common stock, worth roughly $5.0 million.

25.     Defendant Michelle J. Robertson ("Robertson") has served as EVP and Chief Financial Officer ("CFO") since September 2023. Defendant Robertson is named as a defendant in the Securities Class Actions. As of March 1, 2024, Defendant Robertson beneficially owned 232,292 shares of Geron common stock, worth $524,980.

26.     Defendant Faye Feller ("Feller") has served as EVP and Chief Medical Officer since July 2022. Defendant Feller is named as a defendant in the Securities Class Actions.

27.     Defendant Anil Kapur ("Kapur") served as EVP of Corporate Strategy and Chief Commercial Officer ("CCO") from December 2019 until August 31, 2024. Defendant Kapur is named as a defendant in the Securities Class Actions.

28.     Defendant Jim Ziegler ("Ziegler") has served as EVP of Corporate Strategy and CCO since September 9, 2024. Defendant Ziegler is named as a defendant in the Securities Class Actions.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

29.    By reason of their positions as officers and/or directors of Geron, and because of their ability to control the business and corporate affairs of Geron, the Individual Defendants owed Geron and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Geron in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Geron and its shareholders so as to benefit all shareholders equally.

30.    Each director and officer of the Company owes to Geron and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

31.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Geron, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

32.    To discharge their duties, the officers and directors of Geron were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

33.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Geron, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

34.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty: to ensure that Geron implemented and properly

monitored the Company's internal controls over financial reporting; to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations; and to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

35.    To discharge their duties, the officers and directors of Geron were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Geron were required to, among other things:

(a)  ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Geron's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)  conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)  remain informed as to how Geron conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)  establish and maintain systematic and accurate records and reports of the business and internal affairs of Geron and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent

investigation to be made of, said reports and records;

(e)  maintain, implement, and monitor an adequate and functioning system of internal legal, financial, and management controls, such that Geron's publicly disclosed financial information would be accurate;

(f)  exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)  refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)  examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

36.    Each of the Individual Defendants further owed to Geron and the shareholders the duty of loyalty requiring that each favor Geron's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

37.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Geron and were at all times acting within the course and scope of such agency.

38.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Geron.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

39.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

aided and abetted and/or assisted each other in breaching their respective duties.

40.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

41.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

42.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Geron, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

43.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

44.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Geron and at all times acted within the course and scope of such agency.

## **GERON'S CODE OF CONDUCT**

45.     The Code of Conduct begins with a commitment to "maintaining high standards of business conduct and ethics."

46.     The Code of Conduct applies to "every employee, officer, and director" of Geron, and those who violate the Code of Conduct "may be subject to disciplinary action, which . . . may range from a warning or reprimand up to and including termination of employment and, in

9

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

appropriate cases, civil legal action or referral for regulatory or criminal prosecution."

47.    In a section titled "**Honest and Ethical Conduct**," the Code of Conduct states:

It is the policy of GERON to promote high standards of integrity and ethics by conducting our affairs in an honest and ethical manner. The integrity and reputation of GERON depends on the honesty, fairness and integrity brought to the job by each person associated with us. Unyielding personal integrity is the foundation of corporate integrity. It is GERON's expectation that all of its directors, officers and employees, wherever located and regardless of function, conduct all activities in accordance with high standards of integrity and ethics, and in compliance with the laws, regulations, and written directives in every country, as well as with this Code and all other corporate and governmental policies. This expectation extends to third parties with whom we may contract to conduct activities on our behalf.

48.    In a section titled "**Legal Compliance**," the Code of Conduct states, in pertinent part:

Obeying the law, both in letter and in spirit, is the foundation of this Code. Our success depends upon each employee's operating within legal guidelines and cooperating with local, national and international authorities. We expect employees to be familiar with and understand the legal and regulatory requirements applicable to their business units and areas of responsibility.

49.    In a section titled "**Conflicts of Interest**," the Code of Conduct states, in pertinent part:

We respect the rights of our employees to manage their personal affairs and investments and do not wish to impinge on their personal lives. At the same time, employees should avoid conflicts of interest that occur when their personal interests may interfere in any way with the performance of their duties or the best interests of GERON. A conflicting personal interest could result from an expectation of personal gain now or in the future or from a need to satisfy a prior or concurrent personal obligation. We expect our employees to be free from influences that conflict with the best interests of GERON or might deprive GERON of their undivided loyalty in business dealings. Even the appearance of a conflict of interest where none actually exists can be damaging and should be avoided. Whether or not a conflict of interest exists or will exist can be unclear. Conflicts of interest are prohibited.

50.    In a section titled "**Maintenance of Corporate Books, Records, Documents and Accounts; Financial Integrity; Public Reporting**," the Code of Conduct states, in pertinent part:

The integrity of our records and public disclosure depends upon the validity, accuracy

and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, service providers, creditors, employees and others with whom we do business. As a result, it is important that our documents, books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.

* * *

Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the United States Securities and Exchange Commission, or SEC. Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosures are accurate and transparent and that our reports contain all of the information about GERON that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures.

51.     In a section titled "**Protection and Proper Use of Geron Assets**," the Code of Conduct states, in pertinent part, that "[a]ll employees are expected to protect our assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on our profitability."

## <u>GERON'S AUDIT COMMITTEE CHARTER</u>

52.     Pursuant to Geron's Audit Committee Charter, the purpose of the Audit Committee is to:

[A]ssist the Board in fulfilling its oversight responsibilities relating to: the integrity of the financial statements and other information provided by the Company to any governmental body, regulatory agency or the public; the Company's system of internal controls regarding finance, accounting, financial reporting and public disclosures; the Company's compliance with legal and regulatory requirements and with ethics policies that management and the Board have established; the qualifications, independence, and performance of the Company's independent registered public accounting firm ("independent auditors"); and the Company's accounting and financial reporting processes generally.

53.    In a subsection titled "<u>Review of Financial Statements</u>," the Audit Committee Charter tasks the Audit Committee with the following responsibilities:

- Prior to dissemination to the public: (i) review with the CEO, CFO, and/or CLO the accuracy of the financial statements contained in SEC Forms 10-Q, Forms 10-K and associated press releases issued by the Company; (ii) review and discuss with the CEO, CFO, and/or CLO any material, proposed compliance-related disclosures in the Company's annual and quarterly financial statements; (iii) prior to the issuance of earnings or announcement of guidance, the Committee shall review and approve any such disclosure with the CEO, CFO and/or CLO to ensure that the proposed disclosure has a reasonable basis and that material risks and contingencies are properly disclosed; and (iv) discuss with the CEO, CFO and/or CLO any earnings guidance provided to analysts and rating agencies, and other reports or financial information submitted to any governmental body or the public in connection with such financial information, including any certification, report, opinion, or review rendered by the independent auditors.

- Review with the CEO, CFO and/or CLO and the independent auditors the financial statements and disclosures under Management's Discussion and Analysis of Financial Condition and Results of Operations to be included in the Company's Forms 10-K or Forms 10-Q prior to filing, including their judgment about the quality and acceptability of the Company's accounting principles, the reasonableness of significant judgments, the clarity of the disclosures, and the degree of aggressiveness or conservatism of the Company's accounting principles and underlying estimates. The Committee shall discuss the results of the annual audit or quarterly review and any other matters required to be communicated to the Committee by the independent auditors under generally accepted auditing standards, including all critical audit matters ("CAMs") proposed by the independent auditor to be included in the independent auditor's annual audit report.

- Following completion of the annual audit, review separately with management and with the independent auditors any significant difficulties encountered during the audit, including any restrictions experienced by the independent auditors on the scope of their work or access to required information. Among the items that the Committee should consider reviewing with the independent auditors are: (i) any accounting adjustments that were noted or proposed by the independent auditors but were "passed" (as immaterial or otherwise); (ii) any communications between the independent auditors' audit team and their national office with respect to auditing or accounting issues encountered during the audit; and (iii) any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditors to the Company. The Committee shall obtain assurances from the independent auditors that Section 10A(b) of the Exchange Act has not been implicated.

- Review any significant disagreement among management, non-management employees and the independent auditors in connection with the preparation of the Company's annual financial statements and any related disclosures.

54.    In a subsection titled "<u>Review of Disclosure Matters</u>," the Audit Committee Charter states that the Audit Committee shall:

- Monitor the Company's internal control over financial reporting and review any significant changes in its internal controls.

- Review any material weaknesses or significant deficiencies identified in internal control over financial reporting, as well as any remediation plan to address internal control deficiencies.

55.    In a subsection titled "<u>Establishment and Oversight of Policies, Programs and Procedures</u>," the Audit Committee Charter tasks the Audit Committee with the following responsibilities:

- Review with the independent auditors and management the adequacy and effectiveness of the Company's accounting, financial, disclosure and other controls, both internal and external, of the Company, including the Company's legal and ethical compliance programs, and elicit any recommendations for the improvement of such internal control procedures or particular areas where new or more detailed controls or procedures are desirable, including the adequacy and effectiveness of the Company's information and cyber security policies, the internal controls regarding information security and any significant deficiencies and significant changes in internal controls. Particular emphasis should be given to the adequacy of such internal controls to expose any payments, transactions, or procedures that might be deemed illegal or otherwise improper.

- Discuss with management the Company's policies and procedures with respect to risk assessment and risk management.

56.    In a subsection titled "<u>Review of Compliance</u>," the Audit Committee Charter states that the Audit Committee shall:

Review the adequacy of and management's implementation and monitoring of the Company's internal control over financial reporting to ensure that the Company's financial statements, reports and other financial information disseminated to governmental organizations and the public satisfy legal requirements.

13
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## SUBSTANTIVE ALLEGATIONS

*Background*

57.     Geron is a commercial-stage biopharmaceutical company that specializes on developing therapies for the treatment of cancer. The Company's primary product is imetelstat, sold under the brand name Rytelo. Rytelo is a telomerase inhibitor aimed at treating hematologic malignancies, including myelofibrosis and essential thrombocythemia.

58.     On June 6, 2024, the Company secured FDA approval for Rytelo for use in the treatment of adult patients with transfusion-dependent anemia, defined as those with low to intermediate-risk myelodysplastic syndromes, requiring four or more red blood cell units over the course of eight weeks and who are not eligible for erythropoiesis-stimulating agents.

*Materially False and Misleading Statements*

59.     On February 28, 2024, the Company filed its 2023 annual report on Form 10-K with the SEC, which was signed by Defendants Robertson, Scarlett, Aggarwal, Bir, Lawlis, McDonald, Molineaux, O'Farrell, and Spiegel (the "2023 10-K"). In discussing Geron's "Commercial Plans for Imetelstat," the 2023 10-K stated:

> If imetelstat is approved in lower-risk MDS for marketing by regulatory authorities, we plan to commercialize imetelstat ourselves in the U.S. ***Our U.S. launch strategy is designed to prepare imetelstat, the market and the company to ensure broad reimbursement and deliver a seamless customer experience to all stakeholders at launch. Several long-lead time activities have already been completed, such as securing a global trademark for the imetelstat brand name; finalizing third party logistics, our distribution network, and our patient support providers; and onboarding highly experienced commercial and medical affairs leadership teams. We continue to conduct pre-commercial preparations for the U.S., such as enhancing and/or establishing company processes and systems to support a potential commercial launch, refining our market research in lower-risk MDS, engaging in marketing and commercial access/reimbursement preparatory efforts, and hiring our sales force, which we expect to occur in the first and second quarters of 2024. We continue to evaluate our strategy for the potential launch and commercialization of imetelstat in Europe.*** Based on our internal estimates of pricing and addressable patient populations in 2031 and if regulatory authorities approve imetelstat for marketing in lower-risk MDS and relapsed/refractory MF, we believe the potential combined total addressable market opportunity in the U.S. and Europe for imetelstat is approximately $7.0 billion, of which lower-risk MDS represents

approximately $3.5 billion and relapsed/refractory MF represents approximately $3.5 billion.[2]

60.     Also on February 28, 2024, the Company issued a press release, announcing fourth quarter and full year 2023 financial results, which quoted Defendant Scarlett as stating:

Geron's progress and execution throughout 2023 has paved the way for a potentially transformational 2024, as we plan for the transition to becoming a commercial company. . . . *We believe that we are in a strong position for value creation, based on our differentiated product candidate, the potential for significant commercial opportunities in transfusion-dependent, lower-risk MDS and relapsed/refractory MF, the excellence and experience of our employees, and the strength of our balance sheet to support a potential U.S. launch*.

61.     During an earnings call, hosted by the Company on the same day (the "4Q23 Earnings Call"), Defendant Scarlett stated:

[W]e ended 2023 with a strong cash position of approximately $378 million, which based on our current plans and expected available resources, we expect will enable us to fund a potential successful launch in transfusion dependent low risk MDS in the US and fund our planned operations into the third quarter of 2025.

*We believe our differentiated product candidates, the very important commercial opportunities in transfusion dependent low risk MDS and relapse/refractory MF, the excellence and experience of our employees, and the financial resources to execute on our near-term milestones, puts us in a strong position for value creation.*

62.     Also during the 4Q23 Earnings Call, Defendant Kapur stated:

Approximately 10% of lower risk MDS patients are not eligible for ESAs and represent a very high unmet need subgroup. RS-negative patients make up approximately 75% of lower risk MDS patients and are a population particularly vulnerable to poor clinical outcomes. There are no therapies indicated for the treatment of anemia in RS negative patients once they are relapsed or refractory to ESAs. RS positive patients make up approximately 25% of the lower-risk MDS patients, and most who are high-transfusion burden lack effective treatment options. These underserved subgroups are at a greater risk for disease progression and suboptimal survival and are in the need for more effective treatment options.

Moving on to an update on US launch preparations, with our PDUFA date just about

---

[2]     Unless indicated otherwise, all emphasis is added.

3.5 months away, we have completed multiple critical launch readiness activities and plan to be ready to launch imetelstat in the US market upon potential approval. Long lead time activities such as securing our global trademark on our brand name, manufacturing of commercial supply are now complete. In preparation of launch, we have also finalized our distribution network and our patient support providers. In addition, we have onboarded and fully integrated a highly experienced commercial and medical affairs team into Geron. We continue to transition Geron towards a commercial company with the integration and adoption of systems and processes to recognize and report revenues and the continued refinement of engagement plans with marketing, commercial access, payer and reimbursement stakeholders.

63.     On March 14, 2024, the Company issued a press release, titled "Geron Announces FDA Oncologic Drugs Advisory Committee Votes in Favor of the Clinical Benefit/Risk Profile of Imetelstat for the Treatment of Transfusion-Dependent Anemia in Patients with Lower-Risk MDS." The press release quoted Defendant Feller as stating:

We are pleased with the Committee's decision to recognize the positive clinical benefit/risk profile of imetelstat for the treatment of transfusion-dependent anemia in adult patients with lower-risk MDS. There are few treatment options and significant unmet medical need remains for these patients, particularly among those with difficult-to-treat subtypes of this blood cancer. . . . ***We believe that imetelstat has the potential to be an important new medicine for patients*** and look forward to continuing our collaboration with the FDA as they complete their review of our New Drug Application.

64.     On March 27, 2024, Geron filed a proxy statement on Form DEF 14A with the SEC (the "2024 Proxy"), soliciting shareholder approval for, *inter alia*, the re-election of Defendants McDonald, Scarlett, and Spiegel to the Board and the compensation of certain of the Company's executive officers, including Defendants Scarlett, Grethlein, and Robertson.

65.     With respect to the Company's "commercial preparation" of Ryleto during 2023, the 2024 Proxy stated:

Throughout 2023, we completed several long-lead time pre-commercial activities, including securing a global trademark for the imetelstat brand name; finalizing third party logistics, our distribution network, patient support providers; and onboarding highly experienced commercial and medical affairs teams. Other pre-commercial preparations for the U.S. are ongoing, including enhancing and/or establishing company processes and systems to support an expected commercial launch, refining

our market research in TD LR-MDS, and engaging in marketing, commercial access, payer, and reimbursement preparatory efforts.

66.    In discussing goals that the Company achieved during 2023, the 2024 Proxy stated that Geron "[g]ained increased visibility of imetelstat in the medical community/market through publication of IMerge Phase 3 results in Lancet; gave oral presentations at ASCO, EHA and ASH, with Medical Affairs/booth presence; onboarded all critical Medical Affairs functions, including Field Medical Liaisons and Head of Medical Information."

67.    With respect to Geron's legal and regulatory compliance and its internal controls over financial reporting, the 2024 Proxy stated that the Audit Committee was responsible for "monitoring our internal control over financial reporting and disclosure controls and procedures and any significant changes in our internal controls" and "overseeing compliance with legal and regulatory requirements as they relate to our consolidated financial statements and accounting matters."

68.    With respect to the Company's risk management function, the 2024 Proxy stated:

Our Board, as a whole, is responsible for broad oversight of all existing and emerging enterprise risk (over the short-, mid- and long-term) and of management's development and execution of mitigation strategies designed to address those risks. In this capacity, our Board has designated committees to assist in its oversight of particular key risks as described below. Oversight of additional matters of potential risk not delegated remain the responsibility of the full Board.

While the Board and its committees oversee risk management, our senior management is responsible for identifying, assessing and mitigating risk on a day-to-day basis. Each committee of our Board meets regularly with key management personnel and, as desired by the applicable committee, outside advisors (including outside counsel, consultants and experts) to oversee risks associated with their respective principal areas of focus. In turn, each committee reports to the Board regularly, fostering awareness and communication of significant matters among all directors, and promoting a coordinated and cohesive approach to enterprise risk oversight. It is management's responsibility to identify various risks facing the Company, bring the Board's attention to material risks, and implement appropriate risk management policies and procedures to manage risk exposure on a day-to-day basis.

69.    On May 2, 2024, the Company issued a press release, announcing its first quarter 2024 financial results. The press release stated, in pertinent part:

"Since the FDA ODAC's 12 to 2 vote in favor of the clinical benefit/risk profile of imetelstat for the treatment of transfusion-dependent anemia in patients with lower-risk MDS in March, we have continued working with the FDA as they complete their review of our New Drug Application, which has a June 16, 2024 PDUFA target action date," said [Defendant] Scarlett[.] ***"We are actively preparing for a successful launch of imetelstat in the U.S., if approved, including most recently onboarding our sales force last month, refining our market research and completing buildout of our enterprise capabilities and systems to support our transition from a clinical to commercial-stage company."***

U.S. Commercial Preparation

Geron has now completed onboarding its commercial team, with the buildout of the full sales organization in April. ***Other commercial preparations for the U.S. are ongoing and on target, including enhancing and/or establishing company processes and systems to support an expected commercial launch, refining market research in TD LR-MDS, and engaging in marketing, commercial access, payer, and reimbursement preparatory efforts.***

70.     During an earnings call, hosted by the Company on the same day (the "1Q24 Earnings Call"), Defendant Scarlett stated:

We're poised for a successful U.S. launch of Imetelstat for the treatment of transfusion-dependent anemia in patients with lower risk MDS. If approved we're deeply excited for the opportunity to bring patients what we believe is an important and differentiated medicine. With our PDUFA date on June 16th, we continue to work closely with the FDA as they complete the review of our new drug application.

*    *    *

In short, we're building on our momentum acting with urgency and fully confident in our readiness for U.S. launch on potential approval. We're also financially well-resourced to support the planned U.S. commercial launch with approximately $465 million on the balance sheet as of March 31 of this year. On the heels of the highly positive ODAC outcome, we raised approximately $141 million in net proceeds from an underwritten public offering of common stock and a pre-funded warrant.

71.     Also during the 1Q24 Earnings Call, Defendant Kapur stated:

We believe that we are positioned very well for commercial value creation and are well-prepared to execute a successful U.S. launch upon potential approval. As [Defendant Scarlett] mentioned in April, we completed the build-out of our full commercial organization with the hiring of our sales force, which is being now integrated and trained so that they will be prepared to be deployed in the field upon

potential approval.

* * *

To support our launch preparation and commercial strategy, we have collected extensive market insights which suggest that Imetelstat is highly differentiated in this transfusion-dependent low-risk MDS market. Our research has shown that medical and payer stakeholders are dissatisfied with available options in the low-risk MDS space which we believe creates an opportunity for Imetelstat.

* * *

We expect to see Imetelstat uptake across ESA ineligible, ESA failed, RS negative, and RS positive high transfusion burden patients. Based on our latest 2024 market research of 50 U.S.-based practicing hematologists across both community and academic settings, on the left-hand side of the slide, you can see that our market research suggests meaningful Imetelstat use in frontline ESA ineligible patients, especially those who are RS negative.

* * *

We believe we are well-positioned to capitalize on Imetelstat opportunity in transfusion-dependent low-risk MDS by building on the unique product profile and executing on the launch critical success factors that are driving our commercial plan. From a prescriber's perspective, we have a few important goals that prescribers embrace the totality of clinical benefit achievable with Imetelstat and understand the efficacy profiles across MDS subgroups, including RS negative and high-transfusion burden patients.

72.    On June 6, 2024, the Company issued a press release, announcing the FDA approval of Rytelo, which stated, in pertinent part:

> ***"With the approval and availability of RYTELO, we believe eligible patients with lower-risk MDS can potentially experience meaningful clinical benefit, particularly the potential for greater than 24 weeks of freedom from the burden of red blood cell transfusions and symptomatic anemia,"*** said [Defendant] Scarlett[.] ***"The approval of RYTELO as the first telomerase inhibitor is a testament to the power of our science and the passion of our people to innovate in the field of blood cancer***. As we celebrate today's momentous milestone, I would like to thank the patients and families, advocates, clinicians, study coordinators and site personnel, scientists, and Geron employees and collaborators past and present whose participation was integral to this achievement and to supporting our transformation into a commercial company."

* * *

IMPORTANT SAFETY INFORMATION

WARNINGS AND PRECAUTIONS

Thrombocytopenia

RYTELO can cause thrombocytopenia based on laboratory values. In the clinical trial, new or worsening Grade 3 or 4 decreased platelets occurred in 65% of patients with MDS treated with RYTELO.

Monitor patients with thrombocytopenia for bleeding. ***Monitor complete blood cell counts prior to initiation of RYTELO, weekly for the first two cycles, prior to each cycle thereafter, and as clinically indicated***. Administer platelet transfusions as appropriate. Delay the next cycle and resume at the same or reduced dose, or discontinue as recommended.

Neutropenia

RYTELO can cause neutropenia based on laboratory values. In the clinical trial, new or worsening Grade 3 or 4 decreased neutrophils occurred in 72% of patients with MDS treated with RYTELO.

Monitor patients with Grade 3 or 4 neutropenia for infections, including sepsis. ***Monitor complete blood cell counts prior to initiation of RYTELO, weekly for the first two cycles, prior to each cycle thereafter, and as clinically indicated***. Administer growth factors and anti-infective therapies for treatment or prophylaxis as appropriate. Delay the next cycle and resume at the same or reduced dose, or discontinue as recommended.

73.     On June 7, 2024, the Company hosted an investor call to discuss the FDA approval of Rytelo (the "June 7, 2024 Investor Call"). During the June 7, 2024 Investor Call, Defendant Scarlett touted Rytelo's commercial prospects:

RYTELO is now the first and only FDA-approved telomerase inhibitor.

* * *

The approval of RYTELO, with lower-risk MDS, with transfusion-dependent anemia, broadly across ESA ineligible and ESA relapse and refractory subpopulations, regardless of ring sideroblast or RS status, has the potential to transform the treatment paradigm for these patients who remain in high unmet need despite currently available treatment options. Approximately 10% of lower-risk MDS patients are not eligible for ESAs and have very limited treatment options. RS-positive patients make up

approximately 25% of lower-risk MDS patients, and we must continue to experience high transfusion burden despite available therapies.

***RS-negative patients make up approximately 75% of lower-risk MDS patients in our population particularly vulnerable to poor clinical outcomes. There are approximately 13,200 U.S. patients with lower-risk MDS who need treatment for symptomatic anemia***. We believe that RYTELO can become part of the standard of care and help address unmet need in lower-risk MDS patients with transfusion-dependent anemia who are ESA ineligible, ESA relapsed/refractory RS-negative and ESA relapsed/refractory RS-positive with high transfusion burden.

74.    Defendant Kapur added the following:

***On this next slide, we believe RYTELO offers a compelling value proposition for stakeholders.*** Lower-risk MDS is a blood cancer that often progresses to require increasingly intensified management of key symptoms such as anemia and resulting fatigue. Many lower-risk MDS patients with symptomatic anemia frequently become red blood cell transfusion dependent, which has been shown to be associated with short- and long-term clinical consequences that reduce quality of life and survival. ***There is a high unmet treatment need for patients with lower risk MDS as many progress and are not responding to current treatments, achieving a durable response or experiencing extended and continuous red blood cell transfusion independence.***

* * *

From our perspective, these guidelines reflect a lack of effective new treatment options, in particular, for those patients who are ESA ineligible high-transfusion burden patients and for RS negative lower-risk MDS patients who constitute an estimated 75% of this market. This is a need, we believe, RYTELO can powerfully address as a potential, durable treatment that can be used broadly across these MDS subtypes. We expect to see RYTELO uptake across ESA ineligible, ESA failed RS-negative and RS-positive high transfusion burden patients. Based on our latest market research, which was completed earlier this month, with 37 community and 20 academic U.S.-based practicing hematologist.

On the left-hand side of this slide, as you can see, our research suggests meaningful RYTELO use in frontline ESA-ineligible patients. The right-hand side of the slide shows the estimated second-line population, approximately 85% of which are expected to be ESA or luspatercept experience. ***Our research suggests a broad use of RYTELO across the second line regardless of frontline therapy and particularly for RS-negative patients. Our research supports the significant unmet treatment needs for the low-risk MDS patient population, and we strongly believe that RYTELO can play a meaningful role for eligible low-risk MDS patients moving forward.***

***We plan to conduct a prioritized and targeted launch to a concentrated prescriber base of approximately 8,000 health care professionals. We also plan to cover***

*approximately 2,200 targeted accounts and 70% of the patients are expected to be treated in the community setting with low-risk MDS.* As an infused product, RYTELO will be provider administered. Medicare is expected to be the predominant payer with approximately 84% of the patients falling under the Medicare umbrella.

75.     Later during the June 7, 2024 Investor Call, the following exchange occurred among several analysts and the Individual Defendants:

**Tara A. Bancroft – TD Cowen – VP & Senior Equity Research Analyst**
Congrats on the approval and the great label. Can you describe more about your expectations for the cadence of the launch? Like what are the lowest hanging fruits to address first? And will there be a bolus of initial patients, things like that?

**Defendant Scarlett**
Anil?

**Defendant Kapur**
Sure. Thank you for the question, Tara. I think boluses are hard, Tara, to define and quantify. What I will say is, *what's become very clear is we are launching in a sensitized market and this market is dissatisfied with current options*. As you say, the patients who are probably at the highest requirement for new therapies include patients who are either RS-negative, which is a large patient population, patients who are high transfusion burden and patients who may have seen both ESAs and/or luspatercept and are looking for better treatment options. And I think we are going to see a mix of all of these patients. *But in general, the unmet need within this market is very high, and RYTELO has differentiated data to address all of the subpopulations*.

**Craig for Corinne Johnson – Goldman Sachs – Analyst**
So to start us off here, the label indicates that the drug is indicated for patients who require 4 or more transfusions in 8 weeks. So what portion of the patients does this apply to?

**Defendant Scarlett**
Go ahead, Anil.

**Defendant Kapur**
Great question, Craig. So Craig, just to step back for a second. I just want to note again that low-risk MDS is a progressive disease and transfusion burden, as we have seen through all the clinical publications and real-world data, only continues to increase over time and continues to increase from one therapy to another.

Our research and also data that was published by Dr. Rami at ASH 2023 showed from the real-world data set, *approximately 50% of the patients are high transfusion burdens, which are 4 or more. In addition, our research also indicates that*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*transfusion burden, in the eyes of a physician, is a sliding scale, with many physicians, approximately 80% plus of the physicians we have gone to research with indicating even one or higher on a regular basis is not satisfactory to them. So we expect a vast majority of the patients who are transfusion burden to be provided access to RYTELO.* In addition, the NCCN guidelines will help with our adoption as well. So I'll just stop here to see if I answered your question.

* * *

**Kalpit R. Patel – B. Riley Securities, Inc. – Senior Biotech Analyst**
Many congrats on the approval yesterday. As you sort of model out the launch for imetelstat, what are your expectations for the real world average number of cycles, considering that there are more RS-negative patients in the real world than in the clinical trial settings?

**Defendant Kapur**
So Kalpit, we have not provided that guidance. Our expectation is that duration of treatment across both RS-positive and RS-negative and for all the populations we spoke about is likely to be guided by the totality of clinical evidence and how the patient -- as we said, across the factors, which include achievement of transfusion independence, but also the clinical characteristics that we speak about that physicians monitor for patients, including what they are seeing for hemoglobin rises and how the patient is feeling and decreases in RBC transfusions.

So we will look at RYTELO, we expect RYTELO to behave in a similar way as well within this marketplace and provide more information when appropriate.

**Kalpit R. Patel – B. Riley Securities, Inc. – Senior Biotech Analyst**
Okay. And one more question maybe. Any thoughts on the weekly monitoring requirements for the first 2 cycles and every cycle thereafter? How similar or dissimilar is that from your clinical trial protocol? And does that weekly monitoring impact a particular group of physicians, maybe community doctors? All I'm trying to ask is how reasonable is it to do this for those types of doctors?

**Defendant Kapur**
Faye, do you want to go for it and I can add?

**Defendant Feller**
Yes. Yes. I can take that. Hi Kal. So it is consistent with what was done on the Phase III IMerge study weekly for the first 2 cycles and then monthly prior to dosing in order to manage any potential dose modifications. *This is pretty standard across 4 hematologists, I would say, as closer monitoring, especially in this patient population, it's often merited regardless of what drug you're starting in the beginning of treatment as a patient adjusts to the new treatment and the side effect profile, while monthly before the infusions is pretty standard.*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

I don't know, Anil, if you have anything to add.

**Defendant Kapur**
The only other thing I'll add is, Kalpit, to your question. We also obviously shared our profile and the weekly monitoring is also consistent. ***Many of these patients, as you know, are highly transfusion burden and they are coming to the clinics once a week or at least more than once a month many, many times to get red blood cell transfusion. So this has not been something that has been highlighted as a burden by both community and the academic facilities.***

76.    On July 23, 2024, Geron issued a press release, announcing the departure of Defendant Kapur from the Company, effective August 31, 2024. In the press release, Defendant Scarlett highlighted early indicators of Rytelo's future commercial success and emphasized Defendant Kapur's significant involvement in Rytelo's initial launch:

We are encouraged by the uptake of RYTELO™ we are seeing in the first month of launch and by the positive feedback from customers and are confident that our seasoned commercial leadership team will continue to drive this momentum going forward. . . . We thank Anil for his significant contributions to our business over the past five years, particularly his strategic vision to define the potential market for RYTELO, his articulation of its value proposition and his foundational leadership in building strong commercial organization, which I believe has positioned Geron for long-term success. We wish him the best in his future endeavors.

77.    On August 8, 2024, the Company issued a press release, announcing second quarter 2024 financial results, which quoted Defendant Scarlett as stating:

We are thrilled to have begun the launch of RYTELO, our first commercial product, in June, and are encouraged by the early success we are seeing and the reception from the medical community over these first six weeks. . . . Our field teams have mobilized efficiently and have already interacted with approximately 60% of our top decile 1-4 accounts across the community and academic settings. This has contributed to gratifying uptake – as of July 31, 2024, we estimate that approximately 160 patients have received RYTELO, which is encouraging given the very early stage of this launch. Further, the MDS NCCN Guidelines, which guide clinical decision-making, prescriber behavior and reimbursement decisions, were updated at the end of July to include RYTELO as a Category 1 and 2A treatment of symptomatic anemia in patients with lower-risk MDS. With the introduction of RYTELO as a new therapeutic option, we are seeing increasing dialogue among hematologists rethinking treatment approaches for eligible patients with lower-risk MDS with transfusion-dependent anemia, regardless of ring sideroblast status, and we believe that RYTELO can become part of the standard-of-care for these patients.

78.    During an earnings call, hosted by the Company on the same day (the "2Q24 Earnings Call"), Defendant Scarlett stated, in pertinent part:

> *It was just 8 weeks ago that FDA approved RYTELO, our branded name for imetelstat as the first and only telomerase. And it was just 6 weeks ago that RYTELO became commercially available in the U.S. With our strong commercial infrastructure in place at launch and the efficient mobilization of our field teams, we've seen encouraging early launch results.*
>
> *As of July 31, 60% of the top decile 1-4 accounts had been reached by our team across both community and academic settings. This has led to gratifying uptake. We estimate, again, as of July 31, that approximately 160 patients have received RYTELO, which is quite encouraging given the very early stage of this launch.* The enthusiastic reception for RYTELO that we've seen within the hematology community reinforces the unmet needs for lower-risk MDS patients with symptomatic transfusion-dependent anemia. *Many of our customers are passionate about getting access to RYTELO for their patients, and we've seen a strong push across the U.S. to add RYTELO to formularies, treatment pathways, and EMRs, including in the community setting.*
>
> In addition, the MDS NCCN guidelines were updated this July 25 to include RYTELO as a category 1 and 2A treatment for lower-risk MDS patients. *That is, RYTELO is now designated for use in both RS positive and RS negative first-line ESA ineligible patients as well as in both RS positive and RS negative second-line patients regardless of prior first-line treatment. We believe that these favorable NCCN guidelines have put RYTELO in a strong competitive position.*
>
>                                             * * *
>
> With the introduction of RYTELO as a new therapeutic option, we're seeing increasing dialogue among hematologists, rethinking treatment approaches for eligible low-risk MDS patients with transfusion dependent anemia. Consequently, we believe that RYTELO can become part of the standard of care for both eligible first and second-line patients. As shown on this slide, from the approximately 13,200 U.S. patients with lower-risk MDS who need treatment for symptomatic anemia, approximately 1 in 10 are ESA ineligible due to serum EPO levels higher than 500 mU/mL.
>
> These first-line patients have limited treatment options. RS-positive patients make up approximately 25% of the lower-risk MDS patient population, many of whom continue to experience high transfusion burden despite available therapies. RS-negative patients make up approximately 75% of lower-risk MDS patient populations, many of whom are particularly vulnerable to poor clinical outcomes and have few other treatment options.

79.    Defendant Grethlein continued, touting "early awareness of Rytelo," and stating:

*First, we are pleased with the early awareness of RYTELO among prescribers and payers. Based on our market research before FDA approval in May of 2024 of over 100 U.S. hematologists and oncologists, over 80% of those surveyed were aware of imetelstat*. One in 3 surveyed physicians indicated familiarity with the clinical data and *a majority of these physicians look favorably on the efficacy profile and mechanism of action,* which is especially important for a first-in-class treatment.

Payers are expressing high levels of interest and already have a strong understanding of the RYTELO U.S. prescribing information and IMerge Phase 3 clinical data. From an operational perspective, both dosage strengths of RYTELO, the 188 mg vials and 47 mg vials were available in our distribution channel for customers to order from specialty distributors as of June 27, 2024.

Our distribution network is fully activated with our specialty distributor network actively supporting customer demand across hospitals and community oncology clinics. Across the contiguous 48 states, RYTELO is available to HCPs within 24 to 48 hours from our specialty distribution networks. *We also believe that RYTELO's inclusion in the updated NCCN guidelines has been important in spreading awareness among the prescriber community*.

* * *

*We believe that the strong RYTELO value proposition, commercial foundation and the execution of our entire organization is driving encouraging early results over these first 6 weeks of launch*. As we commented earlier, we estimate that as of July 31, 2024, approximately 160 patients have received RYTELO. This demand was generated in part by reaching approximately 60% of top decile 1 through 4 accounts and includes orders from roughly 115 unique accounts.

*We are seeing an encouraging range of customers ordering RYTELO in these early days from small community to large aggregator accounts with hospitals ranging from community, academic centers, teaching hospitals and large health systems*. In July, we kicked off our national speakers program with the launch of our national broadcast event featuring medical experts, which garnered over 300 medical professional participants. These events are a critical component of our marketing strategy to make sure HCPs are aware of the new treatment option for their eligible patients.

80.    Later during the 2Q24 Earnings Call, Defendant Robertson stated, in pertinent part:

Based on our current operating plans and assumptions, we believe that our existing cash, cash equivalents and marketable securities, together with our projected revenues from U.S. sales of RYTELO, will be sufficient to fund our projected operating requirements into the second quarter of 2026.

81.     On September 9, 2024, Geron issued a press release announcing that Defendant Ziegler would be joining the Company to replace Defendant Kapur. In the press release, Defendant Scarlett stated, in pertinent part, that Defendant Ziegler "brings to Geron an impressive track record of operational excellence, having led multiple high performing teams through product launches. We are thrilled to welcome Jim at this critical time when RYTELO is commercially available in the U.S. and we are seeing encouraging uptake since its launch at the end of June 2024." The press release also quoted Defendant Ziegler as stating that "Geron already has a strong commercial organization and infrastructure in place, and I look forward to partnering with the team to drive a successful U.S. launch and the commercial potential of RYTELO."

82.     On November 7, 2024, the Company issued a press release, announcing third quarter 2024 financial results, which quoted Defendant Scarlett as stating:

> This has been a transformative year for Geron, following our first FDA approval and commercial launch of RYTELO in June. ***The initial full quarter of product revenue from our U.S. launch exceeded our expectations and demonstrates strong execution as a commercial company. These results also reflect the high unmet need in lower-risk MDS and the compelling value proposition of RYTELO for hematologists and patients, giving us confidence in future continued demand and momentum for RYTELO.*** . . . We were also pleased to announce this morning the completion of important synthetic royalty and debt financing transactions with Royalty Pharma and Pharmakon Advisors. We believe that the favorable terms in these transactions reflect the significant commercial potential of RYTELO and provide us with critical flexibility to fuel continued growth and invest in our future.
>
> Recent Business Highlights
>
> - ***Strong execution in the first full quarter of U.S. launch, with net product revenue for RYTELO (imetelstat) of $28.2 million in the third quarter of 2024.***

83.     During an earnings call, hosted by the Company on the same day (the "3Q24 Earnings Call"), Defendant Scarlett stated, in pertinent part:

> Following FDA approval and the commercial launch of RYTELO, our first-in-class telomerase inhibitor, this has been a transformative year for Geron. ***As a result, we believe we're well-positioned to build long-term commercial value with this product***.

*In our first full quarter on the market in the United States, we achieved $28.2 million in RYTELO net product revenue which exceeded our expectations*. The initial quarter of product revenue speaks to our execution as a commercial company as well as the high unmet need in lower risk MDS and the compelling value proposition of RYTELO for hematologists and patients. ***This gives us confidence in future continued demand and momentum for RYTELO***.

Our strong IP position underlies the long-term commercial value proposition for RYTELO. We believe this IP position, including specific claims and our patents covering the indication that's in our FDA label and buttressed by the FDA's grant of orphan drug exclusivity for lower-risk MDS into June of 2031, will provide exclusivity in the United States through August of 2037.

***Today, our primary focus is on continuing to deliver on the initial success we achieved in the third quarter, getting RYTELO to more eligible lower-risk MDS patients and maximizing our opportunity in the U.S. market***. In Europe, we believe that the CHMP review of our RYTELO marketing authorization application in lower-risk MDS could be completed in late 2024 or early 2025 with potential EU approval in the first half of 2025. Subject to receiving this approval, we're continuing to prepare for the potential launch of RYTELO in the EU and are planning to commercialize RYTELO in select EU markets beginning in 2026.

\* \* \*

***In addition to this quarter's strong commercial performance, we were pleased to announce this morning a completion of both the synthetic royalty transaction and a debt financing transaction that together generated $250 million in gross proceeds. These transactions were comprised of $125 million capped synthetic royalty with Royalty Pharma and a $250 million committed senior secured debt facility with funds managed by Pharmakon Advisors, under which we've borrowed $125 million, allowing us to retire existing debt.***

***With this new debt facility, we also have access to an additional $125 million. We believe that the favorable terms we achieved in these transactions reflect the significant commercial potential of RYTELO and coming off a successful first quarter of commercial launch provide us with critical flexibility to fuel continued growth and investment in our future***. Michelle will provide more details on these transactions and on our Q3 results later on this call.

84.    Also during the 3Q24 Earnings Call, Defendant Ziegler similarly touted Rytelo's early success:

As Chip highlighted, we achieved $28.2 million in RYTELO net product revenues in our first full quarter of U.S. sales. In the first few months of launch, ***demand has increased month-over-month with Q3 performance exceeding our expectations***.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*Demand from launch through Q3 has come from 388 ordering centers which represents approximately 45% of our key targeted accounts. This strong start reinforces the high unmet need in RYTELO's clinical profile in first-line ESA ineligible and second line plus lower-risk MDS.*

Our market research indicates treating physicians appreciate RYTELO's differentiated clinical profile in 24-week and 1 year red blood cell transfusion independent rates, median duration of red blood cell transfusion independence and hemoglobin rise. *We believe RYTELO's strong clinical data support broad utilization across treatment eligible patient subgroups in both community and academic settings.*

Patient access is also critical for adoption and uptake and we have achieved significant payer coverage since approval. Payers responsible for approximately 70% of U.S. covered lives have implemented medical coverage policies for RYTELO that are consistent with its FDA label, clinical trials and/or NCCN guidelines. Additionally, our permanent J-code was issued in October 2024 and becomes effective on 1 January 2025. We believe the permanent J-code will streamline billing and reimbursement for centers treating patients with RYTELO.

*I also want to acknowledge questions from investors regarding the trajectory of weekly RYTELO sales as reflected in third-party claims data. We believe that while these claims data may reflect trends in demand that are directionally consistent with what we see internally, there are caveats around this data when we compare them to our own insights, including incomplete weekly data capture. Also, we remain in the early stages of launch and continue to expect week-to-week fluctuations regardless of the source of sales data.*

\* \* \*

*From our own internal demand sales data, so far, the RYTELO sales growth trajectory in the fourth quarter continues to be promising. Overall, we remain confident in our launch progress to date, continued demand for RYTELO, expected momentum into 2025 and the projected long-term growth of the brand.*

*Our #1 commercial priority is to deliver a strong U.S. launch. We are committed to keeping laser-focused on that objective.* We plan to leverage our U.S. launch experience to also prepare for commercialization in select EU countries in 2026 and beyond. Our goal in Europe is to optimize patient access and revenues for imetelstat in prioritized countries. As Chip mentioned, subject to receiving regulatory approval, we are preparing to commercialize RYTELO in select EU countries in 2026. This includes working with experienced third parties who can provide contracted services, including essential critical path activities such as reimbursement, HTA assessments, market access and distribution.

In summary, I want to acknowledge the dedicated cross-functional teams at Geron for all their hard work to ensure that eligible U.S. patients have broad and timely access

to RYTELO. I am inspired by how we have remained focused during this time of transition and I am optimistic in the future. ***We are very pleased with the strong demand for RYTELO across community and academic settings, favorable payer coverage policies and broad utilization across patient segments. These early launch dynamics reinforce our expectations for continued demand and promising growth***.

85.     The statements identified above were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) a lack of awareness of Rytelo among health care providers hindered the Company's ability to take advantage of the purportedly large market for the drug; (ii) Rytelo's commercial prospects were further harmed by seasonality and competition; (iii) the Individual Defendants understated the risks associated with the burdens of the weekly monitoring requirement for Rytelo; (iv) despite descriptions in the 2024 Proxy of the Board's and its committees' oversight responsibilities with respect to risk management, internal controls over financial reporting, and legal and regulatory compliance, the Board and its committees were not adequately fulfilling these responsibilities and were causing or permitting the Company to issue false and misleading statements; and (v) as a result of the foregoing, Rytelo's commercial prospects were materially overstated and the Individual Defendants positive statements concerning the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis at all relevant times.

***The Truth Emerges***

86.     On February 26, 2025, the Company issued a press release, announcing fourth quarter and full year 2024 financial results, revealing stagnating growth. The press release stated, in pertinent part:

Net Loss

For the three and twelve months ended December 31, 2024, the Company reported a net loss of $25.4 million, ***or $0.04 per share***, and $174.6 million, or $0.27 per share, respectively, compared to $52.0 million, or $0.09 per share, and $184.1 million, or $0.32 per share, respectively, for the three and twelve months ended December 31, 2023.

Revenues

Total product revenue, net for the three and twelve months ended December 31, 2024, was ***$47.5 million*** and $76.5 million, respectively. There was no product revenue in the prior year periods, given that RYTELO was approved by the FDA in June 2024.

Total net revenue for the three and twelve months ended December 31, 2024, was ***$47.5 million*** and $77.0 million, respectively, compared to $23,000 and $237,000 for the same periods in 2023. Total net revenue includes license fees and royalties in addition to any product revenue, net. The increase in revenue is due to product revenue from U.S. sales of RYTELO, which was approved by the FDA in June 2024.

87.    During an earnings call, hosted by the Company on the same day (the "4Q24 Earnings Call"), Defendant Scarlett stated:

From a financial perspective, we ended the year with a strong cash position of approximately $503 million, which we expect will enable us to reach profitability without additional financing, if our internal sales and operating expense expectations are met.

***However, despite achieving this revenue in the first 2 quarters of launch, we have observed flat revenue trends over the last few months***. As many of you will recall, beginning a few months into launch, we changed our commercial and medical affairs leadership. Jim Ziegler, our Chief Commercial Officer; and Joe Eid, our EVP of R&D, will discuss their assessments and actions in more detail later in this call.

88.    Also during the 4Q24 Earnings Call, Defendant Ziegler stated:

As described previously by Chip, we achieved $47.5 million in RYTELO net product revenues in the fourth quarter 2024. This demand for RYTELO was supported by strong payer access. Payers responsible for approximately 80% of the U.S. covered lives have implemented medical coverage policies for RYTELO, that are consistent with the FDA label, clinical trials and/or NCCN guidelines.

***New patient starts and duration of treatment are the key primary drivers of revenue***. For duration of treatment, it is important to note that even the longest treated patients in the commercial setting are just hitting the median of approximately 8 months observed in the Phase III IMerge trial and our market research suggests the duration of treatment in commercial RYTELO patients treated to date appears consistent with that observed in IMerge.

***However, with respect to new patient starts, we have observed flatness over the past few months. Specifically, even though we see RYTELO being utilized across RS-negative and RS-positive first-line ESA ineligible, second-line ESA relapse***

*refractory and third-line plus patients, the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than our expectations*.

\* \* \*

We are also assessing other possible root causes for the flat revenue trends and have implemented or are in the process of implementing several changes such as scaling up our analytics capabilities, refining our segmentation and targeting and improving our promotional and sales force effectiveness, which we believe will help us more fully capture the significant commercial opportunity for RYTELO in lower-risk MDS, which I will speak to on the next slide.

As shown on Slide 8 in our earnings deck, we estimate that in 2025, the U.S. RYTELO total addressable lower-risk MDS patient population is approximately 15,400 patients and includes patients recommended in the NCCN guidelines. This includes approximately 3,400 first-line ESA ineligible patients, approximately 7,600 second line and 4,400 third-line plus patients with approximately 75% of patients with RS-negative and 25% of patients with RS-positive status.

As I mentioned, our efforts are particularly focused on the eligible RS-negative population where RYTELO is the only drug approved for ESA relapsed/refractory patients. Assuming the duration of treatment observed in IMerge and based on the current net price, *there is potential to achieve blockbuster status by treating approximately 1/3 of the U.S. RYTELO, total addressable patients*.

89.     Later during the 4Q24 Earnings Call, the following exchange occurred among several analysts and the Individual Defendants:

**Peter Richard Lawson – Barclays Bank PLC – Research Analyst**
Maybe first question would just be around how we think about revenues, your commentary around flat revenues over the last few months. Whether you're seeing any week-over-week growth. And I've seen that comment kind of captures January and February. And then the other component would just be around how we think about 1Q revenues themselves, whether that's flat or growing versus 4Q, and then anything you can tell us around revenues and costs as we think about 2025?

**Defendant Scarlett**
Thanks, Peter. I appreciate the question. So Jim will take this question, which obviously relates to both prior revenues and also for -- you had some questions about potential future revenues in the first quarter. So Jim?

**Defendant Ziegler**
Peter, so our *revenues week-over-week have had some variability. But what I would say is our 4- and 8-week rolling averages underscore the flatness that I*

*characterized on the call. And that flatness continued into the prior week leading up to this call*. So it may be a little bit too early to make a full call on Q1 revenues, but I would characterize and reinforce what we said on the earnings call that *the past couple of months have been relatively flat week-over-week in the 4- and 8-week averages*.

* * *

**Tara A. Bancroft – TD Cowen – VP & Senior Equity Research Analyst**
So I was hoping you could give us maybe some more detail on the seasonality or patterns in general, not only that you're seeing with RYTELO, but it appears to be impacting MDS as a whole with luspatercept too. So I'm curious to get your thoughts on what's happening at a higher level in this indication? And then separately, maybe, Jim, if you could tell us more about the expected cadence of growth this year that we could see with your implemented changes that you suggested?

**Defendant Scarlett**
No, go ahead, to detail on the seasonality and the expected cadence.

**Defendant Ziegler**
Great. So we have started -- or *we saw some seasonality beginning around the holidays, Thanksgiving more specifically. And there is some hesitancy in the market to start some of these products that require, in our case, some monitoring. So there was a little bit of a delay*.

I agree with you that as we looked at other products in this market, and ran correlations between our trends and others, there was a very high correlation. So it didn't just affect, RYTELO, it affected a primary product that's used in this space as well.

In terms of the expected cadence, it's really driven off of our business driver, right? We characterize the most important business driver for us is new patient starts. *As you know, with launch products, often start in later line, third line plus, which we characterized on this call as seeing that's where the majority of our use was, even though we saw earlier line, second line, first-line use.*

So it really depends on our effectiveness in driving market share, not just in third-line plus, but in earlier line, second line and first-line opportunities. *And our expectation is that as we increase our share of voice, our reach and frequency and together with medical affairs, increase education and awareness, we hope to see greater impact and use across all lines of therapy*. But it's not going to happen overnight. Share of voice and increasing the prescribing behaviors will take some time.

* * *

**Faisal Ali Khurshid – Leerink Partners LLC – Research Analyst**
On the trends that you've been seeing, could you comment on like how much of that

33
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

was an impact on new patient starts as opposed to like discontinuations or dose modifications and holidays? I guess, the reason for the question is even if you're starting mostly in third-line patient, like shouldn't you be kind of like adding patients at a consistent rate? And I guess like people are also wondering like the duration of therapy should still be longer than like the time you've been in the market in third line as well? Or is that not the way to think about it?

**Defendant Ziegler**

Faisal, no, I think the way you're thinking about it is exactly right. The primary drivers are new patient starts and duration of treatment. What I said on the call is that duration of treatment at this point, while still early in that, we're only approaching the median duration of treatment in IMerge about right now. That does not appear to be issue based upon our own market research and KOL.

As you know, there isn't perfect data that we can cite only data that we triangulate around. But right now, at this point, we don't believe that duration of treatment is inconsistent with that seen in IMerge. ***And so we have seen some softness and it's related to new patient starts***.

I think the way to characterize it is we saw uptake and unmet need and the treatment was really with some of these early adopters who believe -- who understood and believed in the product and ***it's our obligation to really increase the reach and frequency, the share of voice amongst the majority of physicians who have yet to treat patients with RYTELO***.

\* \* \*

**Gregory Allen Harrison – Scotiabank Global Banking and Markets – Analyst**

What feedback are you getting from KOLs and other providers around why they're not using RYTELO as much in earlier lines of therapy? And are there any differences based on setting as far as academic versus community? It sounds like from your comments just now that the bulk may be in academic?

**Defendant Scarlett**

Thanks, Greg. I think the first message that I would share with you is that our MD and our KOL feedback that have used RYTELO, very simply can be summarized as RYTELO works. ***And we see that in our market research and our one-on-one engagements with the KOLs. I think the biggest opportunity for us is to really increase the reach and frequency, our education and awareness and share of voice especially as you point out with the community***.

I'll just give you a very simple mathematic equation. So if you think about the 15,400 patients that we characterize as treatment eligible and you divide that by the number of MDS treating physicians in the U.S. It only leads to a couple of patients on average that each one of these physicians have. So it's really important for us to make sure that we get out to as many of these physicians in a cost-effective way through our sales

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

team, our medical affairs team, and our nonpersonal efforts to really increase the share of voice.

\* \* \*

**Stephen Douglas Willey – Stifel Nicolaus & Company, Inc. – Director**
Okay. Then maybe just last question. I guess, is what is happening in the U.S., just given the flatness and the trajectory of new patient starts. And I know you're not looking to commercialize in Europe until 2026. But does that now kind of change the cadence of perhaps expansion plans outside of the U.S.? Do you need to get the U.S. on track and kind of growing in a new patient start direction before you embark on anything outside the United States?

**Defendant Scarlett**
Yes, Steve, it's Chip. I think that it would be very easy for us to put our hands on our hearts and say our #1, #2 and #3 focus is on the U.S., the U.S. -- getting the U.S. on track, new patient starts on track, appropriate utilization throughout the areas of high unmet need. And we are absolutely taking care to look at a variety of different options and to start some of the prework for Europe. But I think it would be very, very easy to say that our 90-plus percent of our focus is on the U.S. right now.

\* \* \*

**Emily Claudia Bodnar – H.C. Wainwright & Co., LLC – Vice President & Senior Healthcare Analyst**
I guess on the first one, in terms of new patient starts, are you mainly seeing prescribers who have already used RYTELO, kind of re-prescribe it to new patients? Or is it mostly coming from new prescribers, new centers?

\* \* \*

**Defendant Ziegler**
Great. Thank you. ***On new patient starts, we're seeing repeat prescriptions amongst the early adopters largely at many of the academic medical centers. In the community, it's a little bit more diffused***. So there, we're seeing more breadth than depth. But over time, as with other product launches, I expect that both breadth and depth will continue to grow, especially as physicians gain clinical experience and success with RYTELO.

\* \* \*

**Kalpit R. Patel – B. Riley Securities, Inc. – Senior Biotech Analyst**
Maybe first on the flattening over the past few months. Can you comment on exactly which month you started to see flattening? Was it the beginning of this year? Or was it the beginning of fourth quarter last year?

**Defendant Ziegler**

Kalpit, it's Jim here. ***I would say based upon the rolling 4- and 8-week, we started to see right, let's call it, around the holidays, Thanksgiving holiday going forward***. We do see, as you know, in the weekly data, a lot of variability, which is why we incur more to the 4- and the 8-week rolling averages.

\* \* \*

**Kalpit R. Patel – B. Riley Securities, Inc. – Senior Biotech Analyst**

I think we've had that slide in the deck saying that there are 15,000-plus patients eligible potential $1 billion plus in net revenue. Do you still stand by that $1 billion plus number?

**Defendant Ziegler**

Yes. The bottom line is for physicians that have used RYTELO and based upon our KOL feedback as well as market research, RYTELO works. It's that simple. It's our obligation and opportunity to help educate and increase awareness with a much broader group of physicians across the country, but we absolutely do believe in it.

I think our opportunity is to also drive market development and KOL development. As Joe highlighted, there's a significant opportunity for us to increase the awareness, therefore, leading to initial trial. Initial trial will lead to reinforce success and broader use. It will just take a little bit of time.

90.     On this news, the price of Geron stock declined 32.07% in one day, from a close of $2.37 per share on February 25, 2025 to a close of $1.61 per share on February 26, 2025.

## DAMAGE TO THE COMPANY

91.     As a direct and proximate result of the misconduct detailed above, the Company has incurred and will continue to incur significant financial losses, including but not limited to, the costs of defending against and incurring potential class-wide liability in the Securities Class Actions.

92.     These damages also include the costs of remediating deficiencies in the Company's procedures and controls, compensation and benefits paid to current and former members of the Board and Company executives, who breached their fiduciary duties to Geron, and reputational harm and loss of goodwill.

93.     Furthermore, as a direct and proximate result of the misconduct detailed herein, Geron has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's

1   misrepresentations and management's breaches of fiduciary duties and unjust enrichment.

2   **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

3       94.     Plaintiff brings this action derivatively in the right and for the benefit of the Company

4   to redress injuries suffered and to be suffered as a direct and proximate result of the breach of

5   fiduciary duties by the Individual Defendants.

6       95.     Geron is named solely as a nominal party in this action. This is not a collusive action

7   to confer jurisdiction on this Court that it would otherwise not have.

8       96.     Plaintiff is a current shareholder of Geron and was a continuous shareholder of the

9   Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will

10  adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights

11  and retained counsel competent and experienced in derivative litigation.

12      97.     A pre-suit demand on the Board of Geron is futile and, therefore, excused. At the

13  time this action was commenced, the seven-member Board was comprised of Defendants Bir,

14  Aggarwal, Lawlis, McDonald, Molineaux, O'Farrell, and Siegel (the "Director Defendants").

15  Accordingly, Plaintiff is only required to show that four Directors cannot exercise independent

16  objective judgment about whether to bring this action or whether to vigorously prosecute this action.

17  As set forth below, all of the Board's current members are incapable of making an independent and

18  disinterested decision to institute and vigorously prosecute this action, including because they face

19  a substantial likelihood of liability, and so demand on the Board to institute this action is not

20  necessary because such a demand would have been a futile act.

21      98.     The Director Defendants either knew or should have known of the false and

22  misleading statements that were issued on the Company's behalf and took no steps in a good faith

23  effort to prevent or remedy that situation.

24      99.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein

25  to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's

26  stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein

27  and are therefore not disinterested parties.

28

100.     Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

101.     Defendants Lawlis, O'Farrell, and McDonald serve on the Company's Audit Committee (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, the audits of the financial statements, and oversight with respect to the Company's risk management function and its legal and regulatory compliance. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

102.     The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

103.     All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct. Importantly, none of the Board's current members have taken remedial action to redress the conduct alleged

herein. For instance, none of the Board's current members have sought to enforce the Company's Clawback Policy, which provides that "any incentive compensation received by a former or current executive officer as a result of the Company's attainment of a financial reporting measure, be returned to the Company in the event that the Company is required to make an accounting restatement due to material noncompliance with an accounting standard."

104.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

105.    The acts complained of herein constitute violations of fiduciary duties owed by Geron's officers and directors, and these acts are incapable of ratification.

106.    The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of Geron. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Geron, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

107. If there is no directors' and officers' liability insurance, then the directors will not cause Geron to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

108. Thus, for all of the reasons set forth above, all of Geron's current directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I

### Against the Individual Defendants for Violations of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 (17 C.F.R. § 240.14a-9)

109. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

110. The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

111. The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2024 Proxy filed with the SEC. As alleged above, this filing contained materially false and misleading statements concerning Rytelo's commercial prospects and the adequacy of the Company's internal controls over financial reporting, risk management function, and legal and regulatory compliance.

112. The 2024 Proxy was used to solicit shareholder votes in connection with the election of Defendants McDonald, Scarlett, and Spiegel to serve for another one-year term on the Company's Board. In addition, the 2024 Proxy was also used to solicit the advisory vote to approve the compensation of, *inter alia*, Defendants Scarlett, Grethlein, and Robertson. While the shareholder vote was non-binding, the 2024 Proxy indicated that "the Board and the Compensation Committee will review the results of the vote and take them into account when considering future executive compensation policies and decisions."

113. With respect to the Company's "Compensation Policies and Practices," the 2024 Proxy states that the "Compensation Committee maintains a pay for performance compensation

philosophy."

114.    The materially false and misleading statements contained in the 2024 Proxy therefore misleadingly induced shareholders to vote in favor of the election of Defendants McDonald, Scarlett, and Spiegel and for payment of performance-based compensation to Defendants Scarlett, Grethlein, and Robertson, to which they were not entitled.

115.    The payment of unwarranted performance-based compensation to these Company executives was a waste of corporate assets.

## COUNT II

### Against the Individual Defendants
### For Breach of Fiduciary Duty

116.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

117.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

118.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

119.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to implement and monitor adequate internal controls over the Company's financial reporting and, as a consequence, issuing or permitting the issuance of materially false and misleading statements in the Company's SEC filings and other public disclosures. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

120.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

121.    As a result of the misconduct alleged herein, the Individual Defendants are liable to

the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Actions, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Actions, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT III

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

122.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

123.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

124.    Plaintiff, on behalf of Geron, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants For Unjust Enrichment

125.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Geron.

127.    The Individual Defendants either benefitted financially from the improper conduct,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

or received bonuses, stock options, or similar compensation from Geron that were tied to the performance or artificially inflated valuation of Geron, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

128.    Plaintiff, as a shareholder and a representative of Geron, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

129.    Plaintiff, on behalf of Geron, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants
### For Waste of Corporate Assets

130.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

131.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

132.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and collecting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs in defending the Company and its officers against the Securities Class Actions.

133.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

134.    Plaintiff, on behalf Geron, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein,

43

together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

      B.     Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

      C.     Awarding punitive damages;

      D.     Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

      E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**

Dated: April 15, 2025      By:   */s/ Alex J. Tramontano*
                        ALEX J. TRAMONTANO

                        Betsy C. Manifold (182450)
                        Rachele R. Byrd (190634)
                        Alex J. Tramontano (276666)
                        750 B Street, Suite 1820
                        San Diego, CA 92101
                        Telephone: (619) 239-4599
                        Facsimile: (619) 234-4599
                        Email: manifold@whafh.com
                        Email: byrd@whafh.com
                        Email: tramontano@whafh.com

                        **RIGRODSKY LAW, P.A.**
                        Timothy J. MacFall
                        Samir Aougab
                        825 East Gate Boulevard, Suite 300
                        Garden City, NY 11530
                        Telephone: (516) 683-3516
                        Email: tjm@rl-legal.com
                        Email: sa@rl-legal.com

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**GRABAR LAW OFFICES**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Email: jgrabar@grabarlaw.com

*Attorneys for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## <u>VERIFICATION OF EDWARD TROY BISHOP</u>

I, Edward Troy Bishop, am a plaintiff in this action.  I have reviewed the allegations made in the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing.  As to those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  4/11/2025

Edward Troy Bishop